# Exhibit 1

EXECUTION VERSION

**TRANSITION SERVICES AGREEMENT**

**among**

**RESURGENT HOLDINGS LLC,**

**RESURGENT CAPITAL SERVICES L.P.,**

**SQUARETWO FINANCIAL SERVICES CORPORATION**

**and**

**THE DEBTORS' REPRESENTATIVE**

**Dated as of March 3, 2017**

## TRANSITION SERVICES AGREEMENT

This TRANSITION SERVICES AGREEMENT (as amended, restated, supplemented and/or otherwise modified from time to time, this "**Agreement**") is dated as of March 3, 2017, by and among Resurgent Holdings LLC, a Delaware limited liability company, as the Buyer, Resurgent Capital Services L.P., a Delaware limited partnership, as the Master Servicer, SquareTwo Financial Services Corporation (d/b/a Fresh View Solutions), a Delaware corporation, as the Service Provider, and the Plan Administrator or other authorized representative of Wind Down Co or the Dissolving Debtors, as applicable (the "**Debtors' Representative**").   Capitalized definitional terms not otherwise defined herein have the respective meanings set forth in the Plan (as defined below) or, if not defined therein, in the Plan Funding Agreement (as defined below).

## RECITALS

A.      Astrum Financial, LLC; Autus, LLC; CA Internet Marketing, LLC; CACH, LLC d/b/a Fresh View Funding; CACV of Colorado, LLC; CACV of New Jersey, LLC; Candeo, LLC; CCL Financial Inc.; Collect Air, LLC; Collect America of Canada, LLC; Healthcare Funding Solutions, LLC; Metropolitan Legal Administration Services, Inc.; Orsa, LLC; Preferred Credit Resources Limited; ReFinance America, Ltd.; SquareTwo Financial Canada Corporation; SquareTwo Financial Corporation; and SquareTwo Financial Services Corporation d/b/a Fresh View Solutions (together, the "**Debtors**") intend to file voluntary petitions for relief (the "**Bankruptcy Cases**") under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and commence recognition proceedings under Part IV of the Companies' Creditors Arrangement Act (the "**Canadian Cases**"), in the Ontario Superior Court of Justice (the "**Canadian Court**").

B.      This Agreement is entered into contemporaneously with the execution and delivery of a Plan Funding Agreement dated as of the date hereof (as the same may be amended, restated, supplemented and/or otherwise modified from time to time, the "**Plan Funding Agreement**"), pursuant to which SquareTwo agrees, subject to Bankruptcy Court approval, to sell, transfer, assign, convey and deliver to Buyer, and Buyer agrees to purchase, acquire and accept from SquareTwo, the Reorganized Entities Interests (the "**Acquisition**").

C.      In connection with the Acquisition, Buyer and SquareTwo desire that the Service Provider provide, or (subject to the terms of this Agreement) cause an Affiliate or third-party service provider or subcontractor to provide, Buyer and its Affiliates with certain transition services as set forth herein.

D.      Master Servicer is an Affiliate of Buyer, engaged to provide management services with regard to the accounts acquired by Buyer under the terms of the Plan Funding Agreement.

## TERMS AND CONDITIONS

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements contained in this Agreement and the Plan Funding Agreement, and other good

4835-1972-3587

and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **DEFINITIONS**

1.1    "Accounts" means the Serviced Accounts Receivable.

1.2    "Acquired Assets" means, collectively, the Accounts and any other assets listed on Annex A hereto, subject to any exclusions as may be specified on Annex A hereto.

1.3    "Acquisition" has the meaning specified in the Recitals to this Agreement.

1.4    "Alternative Work Space" has the meaning specified in Section 1.18 hereto.

1.5    "Bankruptcy Cases" has the meaning specified in the Recitals to this Agreement.

1.6    "Bankruptcy Court" has the meaning specified in the Recitals to this Agreement.

1.7    "Bankruptcy Proceedings" means, collectively, the Bankruptcy Cases and the Canadian Cases.

1.8    "Buyer" means Resurgent Holdings LLC, a Delaware limited liability company, or any assignee thereof in accordance with Section 10.3 of the Plan Funding Agreement.

1.9    "Canadian Cases" has the meaning specified in the Recitals to this Agreement.

1.10    "Canadian Court" has the meaning specified in the Recitals to this Agreement.

1.11    "Debtors" has the meaning specified in the Recitals to this Agreement.

1.12    "Debtors' Representative" has the meaning specified in the introductory paragraph to this Agreement.

1.13    "Excluded Services" means any services other than those listed, identified or specifically referenced on Annex B or otherwise mutually agreed upon in writing by the Master Servicer and the Service Provider.

1.14    "Force Majeure Event" has the meaning set forth in Section 8.14.

1.15    "Indirect Taxes" means value added taxes, sales taxes, consumption taxes and other similar Taxes.

1.16    "Losses" means any claims, damages, penalties, fines, judgments, awards, settlements, costs, fees (including reasonable and documented investigation fees), expenses (including reasonable and documented attorneys' fees) and disbursements.

1.17    "Master Servicer" means Resurgent Capital Services L.P., a Delaware limited partnership.

1.18    "Master Servicer-Related Losses" means any Losses to the extent such Losses are (a) caused by the gross negligence, willful misconduct, fraud, misrepresentation or bad faith of the Master Servicer or any of its Affiliates in connection with this Agreement or the fulfillment of any obligations hereunder, (b) caused by any breach by the Master Servicer of this Agreement, (c) caused by the failure of the Master Servicer or an Affiliate thereof to lease or otherwise procure the rights to utilize the Premises or any other commercially reasonable commercial or office space to be utilized in providing the Transition Services hereunder (any such space, "Alternative Work Space"), (d) caused by the transition of any operations of SquareTwo (including the Reorganized Entities or Acquired Subsidiaries) from the Premises to any Alternative Work Space at the direction of the Master Servicer, if applicable (a "Work Space Transition"), (e) caused by compliance with any written request by or written instruction from the Master Servicer referencing this Agreement and specifically stating that any Transition Service be provided in any manner other than the Services Standard, (f) related to any real or personal property lease assumed by the Service Provider or any of its Affiliates at the direction of the Master Servicer pursuant to the Plan and associated with the performance of the Transition Services, excluding any such Losses attributable to the period prior to the Closing Date, it being understood that this clause (f) shall be without duplication of costs within the scope of Section 3.2 or (g) related to any conflict with the rights of any third party arising from the Service Provider's or any of its Affiliates' utilization of the license granted pursuant to Section 3.9 in accordance with this Agreement to perform the Transition Services.

1.19    "Maximum Fee" has the meaning specified in Section 3.1 of this Agreement.

1.20    "Out-of-Pocket Costs" has the meaning specified in Section 3.2.3 of this Agreement.

1.21    "Payments" has the meaning set forth in Section 3.10.1 of this Agreement.

1.22    "Plan" means the Joint Prepackaged Chapter 11 Plan for SquareTwo Financial Services Corporation and its Affiliated Debtors (as amended, modified or supplemented from time to time in accordance with its terms, a copy of which is attached as Exhibit A to the Restructuring Support Agreement).

1.23    "Plan Funding Agreement" has the meaning specified in the Recitals to this Agreement.

1.24    "Proceeding" has the meaning specified in Section 8.11 of this Agreement.

1.25    "Premises" means the premises located at 6300 South Syracuse Way, Centennial, Colorado 80111, which are currently subject to that certain Office Lease, effective June 24, 2016, as amended October 20, 2016, by and between AB/SW Cascades Owner, LLC and SquareTwo.

1.26    "Service Provider" means (i) SquareTwo Financial Services Corporation (d/b/a Fresh View Solutions), a Delaware corporation, (ii) Wind Down Co and (iii) any successor thereto resulting from the Bankruptcy Proceedings.

1.27     "Service Provider-Related Losses" means any Losses to the extent such Losses are caused by (a) the gross negligence, willful misconduct, fraud, misrepresentation or bad faith of the Service Provider or any of its Affiliates, subcontractors or third-party service providers in connection with this Agreement, the performance of any of the services contemplated by this Agreement or the fulfillment of any other obligations hereunder, (b) any breach by the Service Provider of this Agreement (including any failure by any of its Affiliates, subcontractors or third-party service providers to perform the Service Provider's obligations in accordance with this Agreement), or (c) the inaccuracy of any representation or warranty made by the Service Provider in this Agreement.  For the avoidance of doubt, Service Provider-Related Losses will not include, and neither Service Provider nor any of its Affiliates will be liable for, any losses, costs, fees or expenses that are caused by, the result of, or are related to (i) the Master Servicer's or any of its Affiliates' failure to lease or procure the use of the Premises or any Alternative Work Space or a Work Space Transition, if applicable or (ii) the failure of the Master Servicer to either approve or disapprove an Out-of-Pocket Cost within the timeframe contemplated by Section 3.2.3 or to fund an Out-of-Pocket Cost (that the Master Servicer has approved) in accordance with Section 3.2.3.

1.28     "Services Standard" means for both (a) the performance of the activities necessary to service the Accounts and (b) the performance of the other Transition Services, the performance thereof:  (i) in accordance with applicable law, and (ii) consistent with the level of efficaciousness, results and quality of services provided by the Service Provider with respect to its accounts and related receivables for the six months prior to the date of this Agreement. Notwithstanding the preceding, the parties acknowledge and agree that certain activities (including, without limitation, outbound collection calls) shall not be required to be performed under this Agreement with the same frequency or under the same conditions as they may have been performed prior to the date of this Agreement, provided that such changes are described in Schedule 1.28 hereto or otherwise approved in writing by the Master Servicer which consent shall not be unreasonably withheld, conditioned or delayed.  The Services Standard shall be deemed modified accordingly as to the performance of any such activities.

1.29     "SquareTwo" means SquareTwo Financial Corporation, a Delaware corporation.

1.30     "Transition Period" has the meaning specified in Section 2.1 of this Agreement.

1.31     "Transition Services" means all of the services listed, identified or referenced on Annex B and any other additional services that may be mutually agreed to in writing by Master Servicer and the Service Provider from time to time.

1.32     "Wind Down Co" shall have the meaning set forth in the Plan.

Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented and/or otherwise modified, and (ii) any reference to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein or in any related document).

1.33    "Work Space Transition" has the meaning specified in Section 1.18 of this Agreement.

2.    **PROVISION OF SERVICES**

2.1    Services During the Transition Period.  Buyer and Master Servicer acknowledge that the Service Provider is not in the business of providing services to third parties and is entering into the Agreement only in connection with the Plan Funding Agreement.  Subject to the terms and conditions of this Agreement, the Service Provider shall provide the Transition Services to the Buyer and its Affiliates (including the Master Servicer) in accordance with the Services Standard during the period (the "**Transition Period**") that shall commence on the Closing Date and shall, with respect to each particular Transition Service, continue for the period of time shown on Annex B for that particular Transition Service, unless earlier terminated in accordance with Section 2.2.  The Service Provider shall not be obligated to perform any Transition Service in any manner other than the Services Standard that may be requested or instructed by the Master Servicer.  The Transition Period with respect to any specific Transition Service may be extended by written agreement of all of the parties hereto.  From the Closing Date until the end of the Transition Period with respect thereto, the Service Provider shall service (or cause its Affiliates to service) the Accounts in accordance with the Services Standard and as described in Annex B.  Under no circumstances shall Service Provider, its Affiliates or its or their respective employees or agents be held accountable to a greater standard of care, effort or skill under this Agreement than the Services Standard.  For the avoidance of doubt, the Transition Services do not include, and the Service Provider shall have no obligation to provide, any Excluded Service, nor shall the Service Provider be obligated to provide or cause to be provided any Transition Services for the benefit of any Person other than Buyer, Master Servicer and their respective Affiliates.

2.2    Phase Out or Termination of Transition Services.  The parties hereto acknowledge the transitional nature of the Transition Services.  Accordingly, as promptly as reasonably practicable following the Closing Date, the Master Servicer shall use commercially reasonable efforts to make a transition of each Transition Service to its own internal organization or to obtain alternate third-party sources to provide the Transition Services.  For the avoidance of doubt, if the Master Servicer cannot or does not make a transition of any Transition Service to the Master Servicer's own internal organization prior to the expiration of the applicable Transition Period for such service, neither the Service Provider nor any of its Affiliates will be required to provide such Transition Service beyond the termination of such Transition Period unless otherwise agreed to in writing by the Service Provider.  Master Servicer shall have the right to direct that any or all of the Transition Services be terminated effective on a date established by the Master Servicer that is prior to the termination date for such Transition Service shown on Annex B.  Such termination will be effective no earlier than ten (10) Business Days after written notice of termination is received by the Service Provider, unless the Service Provider consents in writing to a shorter period.

2.3    No Rejection.  This Agreement may not be rejected in the Bankruptcy Proceedings without the express written consent of the Master Servicer.  The Master Servicer shall have no obligation to consent to such rejection, and may do so in its sole discretion.

2.4     Support by Debtors.   Each of the Debtors shall provide such information, cooperation and other support as is necessary for the Service Provider to perform all of its obligations under this Agreement from time to time.

2.5     Delivery of Services by Affiliates, Third Parties and Subcontractors.  The Service Provider may engage one or more of its Affiliates, third-party service providers and/or subcontractors for the purpose of providing the Transition Services; provided, however, that (a) the Service Provider shall remain responsible for the performance of the Transition Services in accordance with this Agreement notwithstanding the engagement of any such Person; and (b) any such third-party service provider or subcontractor that is not an Affiliate of the Service Provider and does not provide such service to the Service Provider as of the date hereof shall be subject to the Master Servicer's prior written consent, not to be unreasonably withheld, conditioned or delayed.

2.6     Incorporation by Reference.   All provisions of the Plan and the Plan Funding Agreement related to Transition Services, including Section 2.3(b) of the Plan Funding Agreement and Section 7.13 of the Plan, as defined therein, are hereby incorporated by reference herein *mutatis mutandis*.

3.      **PAYMENT FOR SERVICES; RESOURCES APPLIED**

3.1     Maximum Fee.  The maximum aggregate amount payable by the Master Servicer to the Service Provider for the Transition Services provided under the terms of this Agreement, including Taxes, Indirect Taxes and Master Servicer-Related Losses paid pursuant to Section 7.1, shall not exceed sixteen-million two-hundred-ninety-one-thousand dollars ($16,291,000) (the "**Maximum Fee**"), unless the Master Servicer and the Service Provider mutually agree in writing to a higher amount, including pursuant to Section 3.7 or Section 3.8.

3.2     Monthly Fees; Out-of-Pocket Costs.  Subject to the Maximum Fee (except to the extent provided otherwise in Section 3.2.3(b) below with respect to Out-of-Pocket Costs and as such Maximum Fee may be amended pursuant to Section 3.7 or Section 3.8), the following amounts shall be payable by the Master Servicer to the Service Provider in consideration of the performance of the Transition Services hereunder:

3.2.1   An administrative fee in the fixed amount of one-hundred-fifty-thousand dollars ($150,000) each month during the Transition Period to cover all overhead and operating costs associated with providing the Transition Services.

3.2.2   The amount of the "personnel costs" incurred by the Service Provider to employ each of the employees as included in Annex C; provided that:

(i)     the Master Servicer may require the Service Provider to terminate (and the Service Provider shall, on the date directed by the Master Servicer, terminate) any one or more person(s) shown in Annex C prior to the applicable termination date so long as (a) the Service Provider does not reasonably object thereto on the basis that it will adversely impact the Service Provider's ability to provide the applicable Transition Service(s) in accordance with the Services Standard; and (b) such early termination complies with all applicable laws.  If such early termination will adversely impact the Service Provider's ability to provide the Transition

4835-1972-3587

Services, then Service Provider shall immediately notify the Master Servicer thereof, including a reasonably detailed description of the basis for such determination; and

(ii)     in the event that any employee is unable or unwilling to perform its responsibilities for the time period shown in Exhibit B, the Service Provider shall promptly notify the Master Servicer thereof in writing, and then the Master Servicer and the Service Provider shall negotiate reasonably and in good faith to promptly replace such employee and/or modify the related Transition Service(s).  In such event, the scope and cost of the related Transition Service(s) shall be adjusted accordingly, as reasonably determined by the Master Servicer and the Service Provider.

3.2.3   The amount of (a) the "overhead costs" and "collection related expenses" incurred by the Service Provider in the provision of the Transition Services, in each case as included in Annex C, and (b) all other reasonable and documented out-of-pocket fees, liabilities, costs and expenses incurred, or to be incurred, by the Service Provider and its Affiliates in the provision of the Transition Services (such fees, liabilities, costs and expenses contemplated by this clause (b), collectively, "**Out-of-Pocket Costs**"); provided that (i) all such material Out-of-Pocket Costs (including, without limitation, those incurred or expected to be incurred in the defense of any lawsuit arising out of the Accounts, including related attorneys' fees and expenses and settlement costs and fees and the terms of any settlement) shall be subject to the Master Servicer's written approval (not to be unreasonably withheld, conditioned or delayed), which approval (or disapproval) shall be communicated in writing to the Service Provider within two (2) Business Days of a request for such approval and promptly funded to the Service Provider following any such approval, and (ii) the Service Provider shall not be obligated to incur or pay any Out-of-Pocket Costs that have not been approved in writing and funded by the Master Servicer.  Notwithstanding anything to the contrary herein, the Out-of-Pocket Costs shall not be subject to, or considered in calculating, the Maximum Fee.

3.3     Payments in Advance.  The Master Servicer shall pay the Service Provider the amounts payable under Section 3.2.1, Section 3.2.2 and Section 3.2.3 each month in advance on the Closing Date and on the same calendar day of each succeeding calendar month during the Transition Period (or, as to any such calendar day that is not a Business Day, the next succeeding Business Day) in the amounts reflected in Annex C (giving effect to the adjustments thereto from time to time as contemplated by this Agreement and/or otherwise mutually agreed upon between the Master Servicer and the Service Provider), other than material Out-of-Pocket Costs which shall be funded, if approved, in accordance with Section 3.2.3.  If the Service Provider has failed to deliver the schedule contemplated by Section 3.4 and/or the Master Servicer and the Service Provider have not agreed upon a revised Annex C based on such schedule, in each case by the date upon which a payment would otherwise be due under this Section 3.3, then the Master Servicer will pay the same total amount (for the amounts reflected in Annex C) that the existing Annex C contemplated for the upcoming month.

3.4     Schedule of Amounts.  At least five (5) Business Days prior to each date upon which a payment is scheduled to be due under Section 3.3, the Service Provider shall use reasonable best efforts to provide the Master Servicer with a schedule of the amounts reflected in Annex C and all Out-of-Pocket Costs that the Service Provider reasonably believes in good faith will be due and owing by the Master Servicer to the Service Provider under this Agreement for

7

the following month.  The Master Servicer shall promptly review such costs and either approve them or notify the Service Provider of any disputed amounts.  The parties shall then work in good faith to promptly resolve any disputes; provided that notwithstanding any such dispute, the Master Servicer shall be obligated to make the payment required by Section 3.3 for the following month.

3.5     Interest.  Any undisputed payments under this Agreement that are not made on or before the applicable due date shall bear interest at a rate equal to the lesser of (a) two percent per annum above the Prime Rate, as reported in the print edition of *The Wall Street Journal*, Eastern Edition, on the date such payment was due or, if unavailable, on the latest date prior to the payment due date on which such rate is available and (b) the maximum rate permitted under applicable Law, calculated on a daily basis, based on the actual number of days elapsed from the payment due date to the date of actual payment.

3.6     True Up.  Within thirty (30) days after the end of each month during the Transition Period, the Master Servicer and the Service Provider will mutually determine the actual amounts payable to the Service Provider for the Transition Services provided during such month pursuant to Section 3.2.1, Section 3.2.2 and Section 3.2.3 (each such amount, the "Actual Payment").  Each of the Master Servicer and the Service Provider shall work in good faith and in a commercially reasonable manner in connection with each such determination.  If the sum of the amount of Out-of-Pocket Costs actually paid by the Master Servicer to the Service Provider pursuant to Section 3.2.3(b) for such month plus the amount actually paid by the Master Servicer to the Service Provider pursuant to Section 3.3 for such month (collectively, the "Monthly Payment") exceeds the Actual Payment for such month, then the Service Provider will promptly (and in any event within two (2) Business Days) pay such excess to the Master Servicer; provided that, if the Service Provider fails to do so, the Master Servicer may instead reduce the next payment or payments due from the Master Servicer to the Service Provider pursuant to Section 3.3 by the amount of such excess.  If the Actual Payment exceeds the Monthly Payment, the Master Servicer will pay promptly (and in any event within two (2) Business Days) such excess to the Service Provider.

3.7     Inability to perform Transition Services.  The amounts shown in Annex C are intended to be a good faith cost estimate prepared by the Service Provider.  If at any time following the date hereof the actual costs (excluding Out-of-Pocket Costs) incurred by the Service Provider in providing the Transition Services in accordance herewith, in the aggregate, would exceed the Maximum Fee (as such amount may have been previously adjusted in accordance with this Section 3.7 or Section 3.8), then, notwithstanding anything to the contrary contained in this Agreement, the Service Provider shall not be obligated to thereafter provide further Transition Services that cost in excess of such specified dollar amount unless the Master Servicer agrees in writing to bear and pay such additional costs.

3.8     Potential Adjustments.  Notwithstanding the foregoing or anything to contrary herein, on or about October 31, 2017, the Service Provider shall engage in good faith discussions with respect to the Transition Services provided to date, and to be provided for the remainder of the Transition Period, the fees and Out-of-Pocket Costs associated therewith, and the Maximum Fee.  The parties may elect to negotiate an amendment in writing to Annex B, Annex C or the amount of the Maximum Fee, in each case in connection with such discussions.  In addition, if

for any reason (including the occurrence any Force Majeure Event) before or after such discussions, the Transition Services to be provided to the Master Servicer increase or decrease in scale or in scope in a material way in comparison to those provided to the Master Servicer as expressly provided for in this Agreement (including the responsibilities in Annex B), the parties shall negotiate in good faith such amendment(s) as may be necessary in order to reflect such modified scale or scope of the Transition Services.  The Service Provider shall not be obligated to provide the increased scale, scope and fees of services if the parties hereto do not, despite using their respective good faith efforts, enter into any such amendment.  The Service Provider and the Master Servicer shall act reasonably and use good faith efforts to promptly reach agreement upon any such amendment.

3.9     License to Acquired Assets.  The Master Servicer hereby grants, and shall cause its Affiliates to grant, if applicable, the Service Provider and its Affiliates with a fully paid, worldwide, royalty free and non-transferable license to utilize, during the Transition Period, any assets acquired by the Master Servicer and/or its Affiliates from the Service Provider and/or its Affiliates in the Acquisition and related transactions (including the Acquired Assets (other than the Accounts)), to the extent that the Master Servicer and the Service Provider agree that the utilization thereof is necessary to perform the Transition Services hereunder; provided, however, that to the extent such a license would conflict with the rights of any third party, then the Master Servicer shall, and shall cause its Affiliates to, make other commercially reasonable arrangements with respect to the applicable acquired assets sufficient to enable the Service Provider to provide the Transition Services hereunder.  In furtherance of the foregoing, the Master Servicer shall, and shall cause its Affiliates to, execute any agreement, instrument or other documentation reasonably requested by the Service Provider in connection with the foregoing license.

3.10     Taxes.

3.10.1 The amounts payable by the Master Servicer to the Service Provider pursuant to this Agreement ("**Payments**") shall not be reduced on account of any Taxes unless required by applicable Law.  The Service Provider alone shall be responsible for paying any and all Taxes (other than withholding Taxes required to be paid by the Master Servicer out of amounts otherwise payable to the Service Provider hereunder) levied on account of, or measured in whole or in part by reference to, any Payments it receives.  The Master Servicer shall deduct or withhold from the Payments any Taxes that it is required by applicable Law to deduct or withhold, and all such amounts deducted and withheld shall be treated for purposes of this Agreement (including, without limitation, Section 3.1) as having been paid to the Service Provider.  Notwithstanding the foregoing, if the Service Provider is entitled under any applicable Tax treaty to a reduction in the rate of, or the elimination of, or recovery of, applicable withholding Tax, it shall timely deliver to the Master Servicer and/or the appropriate Governmental Entity (with the reasonable assistance of the Master Servicer to the extent that this is reasonably required and is expressly requested in writing), as applicable, the prescribed forms necessary to reduce the applicable rate of withholding or to relieve the Master Servicer of its obligation to withhold Tax, and the Master Servicer shall apply the reduced rate of withholding, or dispense with the withholding, as the case may be, to the extent it complies with the applicable Tax treaty.  If, in accordance with the foregoing, the Master Servicer withholds any amount, it shall make timely payment to the proper Tax authority of the withheld amount and

9

send to the Service Provider proof of such payment as soon as reasonably practicable following that payment. The Service Provider shall execute and deliver such documents and information to the Master Servicer, and take such other actions, as may be necessary or reasonably requested by the Master Servicer from time to time to enable the Master Servicer to collect withholding taxes in respect of Payments in accordance with applicable law.

3.10.2 Notwithstanding anything to the contrary contained in this Section 3.10.2 or elsewhere in this Agreement, the following shall apply with respect to Indirect Taxes. All Payments are stated exclusive of Indirect Taxes. If any Indirect Taxes are chargeable in respect of any Payments for which the Service Provider is accountable, the Master Servicer shall pay such Indirect Taxes at the applicable rate in respect of any such Payments following the Master Servicer's receipt of an Indirect Taxes invoice issued in the appropriate form and in reasonable detail by the Service Provider in respect of those Payments, such Indirect Taxes to be payable on the due date of the payment of the Payments to which such Indirect Taxes relate or at the time such Indirect Taxes are required to be collected by the Service Provider, in the case of payment of Indirect Taxes to the Service Provider; provided, however, that payment thereof by the Master Servicer shall in no event be due prior to the fifth (5th) Business Day following the Master Servicer's receipt of the invoice therefor in accordance with this Section 3.10.2. The parties hereto shall issue invoices for all goods and services supplied under this Agreement consistent with Indirect Tax requirements, and to the extent any invoice is not initially issued in an appropriate form, the Master Servicer shall promptly inform the Service Provider and shall cooperate with the Service Provider to provide such information or assistance as may be necessary to enable the issuance of such invoice consistent with Indirect Tax requirements. Each of the Master Servicer and the Service Provider shall execute and deliver such documents and information to the other, and take such other actions, as may be necessary or reasonably requested by the other from time to time to enable the other to comply with applicable law relating to Indirect Taxes in connection with the transactions contemplated by this Agreement.

3.11 This Section 3 shall survive any termination of this Agreement with respect to services performed pursuant to this Agreement for which the Service Provider has not yet been paid in full.

4.   **REPRESENTATIONS AND WARRANTIES**

The Service Provider represents and warrants to the Buyer and the Master Servicer as follows:

4.1   Organization. The Service Provider is duly incorporated, validly existing and (in the jurisdictions recognizing the concept) in good standing under the Laws of the jurisdiction in which the Service Provider is incorporated. The Service Provider is licensed or qualified to do business in each jurisdiction where the conduct or nature of its business or the ownership, leasing or holding of its properties makes such qualification necessary and has the requisite power and authority to own, lease and operate its properties and to conduct its business as it is now being conducted, except, in each case, where such failure, individually or in the aggregate, would not reasonably be expected to materially adversely affect the performance of this Agreement.

4.2     Qualification; Due Authorization; Power and Authority.  Subject to entry of the Confirmation Order, the Service Provider and the Debtors' Representative have all power and authority to execute and deliver this Agreement, and any other agreements contemplated hereby, to consummate the transactions contemplated hereby and to comply with the terms, conditions and provisions hereof applicable to the Service Provider or the Debtors' Representative, as applicable.  The making, execution, delivery and, subject to entry of the Confirmation Order, performance of this Agreement and the consummation by the Service Provider and the Debtors' Representative of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action of the Service Provider and the Debtors' Representative, as applicable.  This Agreement has been duly and validly executed and delivered by the Service Provider and the Debtors' Representative and, assuming the due authorization, execution and delivery hereof and thereof by the Buyer and the Master Servicer, this Agreement (subject to entry of the Confirmation Order) will constitute the valid and binding obligations of the Service Provider and the Debtors' Representative, enforceable against the Service Provider and the Debtors' Representative, as applicable, in accordance with their respective terms (except as such enforcement may be limited by insolvency, reorganization, moratorium, receivership, conservatorship and by general equity principles).

4.3     Consents and Approvals.  Subject to confirmation of the Plan, neither the execution and delivery of this Agreement or any other agreements contemplated hereby by the Service Provider, nor the consummation of the transactions contemplated hereby, will (a) require any consent, approval, authorization, registration or filing under any Law to which the Service Provider is subject; (b) require the consent or approval of any other party to, or conflict with, result in any breach of, or constitute a default (or an event that, with notice or lapse of time or both, would become a default) under, any Contract to which the Service Provider is a party; (c) give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under any agreement or other instrument to which the Service Provider is a party, or result in the creation of any Security Interests or Encumbrances upon any of the properties or assets of the Service Provider or (d) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, operating agreement, by-laws or other organizational documents of the Service Provider or the Debtors' Representative; in each case, other than (i) on or after the Petition Date, the Bankruptcy Court and the Canadian Court, (ii) authorizations, consents, orders or approvals of, or registrations or declarations with, any Governmental Entity set forth on Section 4.3 of the SquareTwo Disclosure Schedule, that have been or will be obtained or made prior to or on the Closing Date and (iii) where the failure to obtain such consents, approvals, authorizations or registrations or to make such filings would not be material to the Service Provider.  Any such authorization, consent, approval, order, registration or declaration that has been obtained, effected or given is in full force and effect as of the date hereof.  Except as a result of the commencement of the Bankruptcy Cases and the Canadian Cases, the Service Provider is not in default under, and no event has occurred that with the lapse of time or action by a third party could result in a default under, the terms of any judgment, order, writ, decree, Permit or license of any Governmental Entity where such default would be material to the Service Provider.

5.     **DISCLAIMER OF WARRANTIES.**   THE SERVICE PROVIDER DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE

OF ANY SERVICES PROVIDED HEREUNDER.  For the avoidance of doubt, the foregoing shall in no event be deemed to modify the Services Standard.

6.     **GOOD FAITH COOPERATION**

6.1     <u>Intent of the Parties</u>.  The Master Servicer agrees that this Agreement does not create a fiduciary relationship, partnership, joint venture or relationship of trust or agency between the Master Servicer, on the one hand, and the Service Provider, on the other hand, and that all Transition Services are being provided by the Service Provider as an independent contractor.  Without limiting the foregoing, each party hereto shall be an independent contractor in the performance of its obligations hereunder.  No third party, including any employee of any party or any of such party's Affiliates, shall have or acquire any rights by reason of this Agreement.

6.2     <u>Cooperation</u>.  Each party hereto shall act in good faith and use commercially reasonable efforts to cooperate with each other in order to achieve the benefits expected and to resolve any problems that may occur in a commercially reasonable way.  As part of that cooperation:

(i)     the Service Provider agrees that it shall, at the reasonable direction of the Master Servicer and consistent with past practices, supervise the activities of its and its respective Affiliates' officers, employees and representatives with respect to the Transition Services and the performance of its other obligations hereunder;

(ii)     the Service Provider shall maintain books and records relevant to the provision of the Transition Services and the performance of its other obligations hereunder in a manner consistent with the continuing needs of the Master Servicer (such records to include, without limitation, (A) traditional and customary collection notes, payment information, and other documents related to the servicing of the Accounts, and (B) documents reasonably necessary to substantiate the costs related to the payments due to the Service Provider hereunder) and will make such books and records available to the Master Servicer upon the Master Servicer's reasonable request;

(iii)     the Master Servicer shall provide to the Service Provider and its Affiliates and shall use commercially reasonable efforts to cause any third-party service providers who provide Transition Services, at no cost to the Service Provider, access to the respective facilities, assets and books and records of the Master Servicer, in all cases to the extent reasonably necessary for the Service Provider to fulfill its obligations under this Agreement; and

(iv)     the Master Servicer may, at its sole and absolute discretion, elect to have its Affiliates or its or their employees or third parties perform any act otherwise agreed herein to be performed by the Service Provider, and such action shall not terminate or modify this Agreement; <u>provided</u>, <u>however</u>, that the Service Provider shall be relieved with respect to its obligations hereunder to the extent that Transition Services are performed by or at the direction of the Master Servicer and also to the extent that such acts impede, prevent or make the provision of the applicable Transition Service materially more costly or difficult to the Service Provider.

12

7. **INDEMNIFICATION AND LIMITATION OF LIABILITY**

7.1     The Master Servicer shall indemnify, defend and hold the Service Provider, its Affiliates, and the officers, directors, managers and employees of the Service Provider and its Affiliates harmless from and against any and all Master Servicer-Related Losses.

7.2     The Service Provider shall indemnify, defend and hold the Master Servicer and its Affiliates, and their respective officers, directors, managers and employees, harmless from and against any and all Service Provider-Related Losses.

7.3     None of the Service Provider, its Affiliates or any employees or agents of the Service Provider or its Affiliates shall be liable to the Master Servicer, its Affiliates or any third party claiming through the Master Servicer or any of its Affiliates for, and the Master Servicer, on behalf of itself, its Affiliates and all third parties claiming through the Master Servicer or any of its Affiliates, releases and forever discharges the Service Provider, its Affiliates and any employees or agents of the Service Provider and its Affiliates from, any and all Losses arising out of or connected with any act or omission of the Service Provider, its Affiliates or any employees or agents of the Service Provider or its Affiliates pursuant to this Agreement or with respect to the Transition Services, other than Service Provider-Related Losses.

7.4     None of the Master Servicer, its Affiliates or any employees or agents of the Master Servicer or its Affiliates shall be liable to the Service Provider, its Affiliates or any third party claiming through the Service Provider or any of its Affiliates for, and the Service Provider, on behalf of itself, its Affiliates and all third parties claiming through the Service Provider or any of its Affiliates, releases and forever discharges the Master Servicer, its Affiliates and any employees or agents of the Master Servicer and its Affiliates from, any and all Losses arising out of or connected with any act or omission of the Master Servicer, its Affiliates or any employees or agents of the Master Servicer or its Affiliates pursuant to this Agreement or with respect to the transactions contemplated hereby, other than Master Servicer-Related Losses.

7.5     NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT AND WITHOUT LIMITING THE FOREGOING, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT AS A RESULT OF FRAUD, MISREPRESENTATION, WILLFUL MISCONDUCT, BAD FAITH OR GROSS NEGLIGENCE IN CONNECTION WITH MATTERS COVERED HEREIN OR IF ANY OF THE FOLLOWING IS PAID OR PAYABLE PURSUANT TO A THIRD PARTY CLAIM, NEITHER THE MASTER SERVICER NOR THE SERVICE PROVIDER SHALL BE LIABLE TO THE OTHER OR THEIR AFFILIATES FOR ANY CLAIMS, DEMANDS OR SUITS FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, INDIRECT OR MULTIPLE DAMAGES, FOR LOSS OF PROFITS, REVENUE OR INCOME, DIMINUTION IN VALUE OR LOSS OF BUSINESS OPPORTUNITY (IN EACH CASE, WHETHER OR NOT FORESEEABLE AT THE EFFECTIVE DATE), OR FOR ANY DAMAGES CALCULATED BY REFERENCE TO A MULTIPLIER OF REVENUE, PROFITS, EBITDA OR SIMILAR METHODOLOGY, CONNECTED WITH OR RESULTING FROM ANY BREACH OF THIS AGREEMENT, OR ANY ACTIONS UNDERTAKEN IN CONNECTION WITH OR RELATED HERETO, INCLUDING ANY SUCH DAMAGES WHICH ARE BASED UPON BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE AND

MISREPRESENTATION), BREACH OF WARRANTY, STRICT LIABILITY, STATUTE, OPERATION OF LAW OR ANY OTHER THEORY OF RECOVERY.

7.6     In the event that the Master Servicer has the right to a payment from the Service Provider under Section 7.2, each of the Buyer and the Debtors' Representative will execute as soon as reasonably practicable a Joint Instruction Letter directing the Escrow Agent to promptly disburse to the Buyer an amount equal to the related Losses in the amount agreed upon by the Master Servicer and the Service Provider, up to and including the then-remaining Post-Closing Escrow Amount.  In the event that the Master Servicer and the Service Provider cannot agree on the amount of the Losses, the dispute resolution process further defined in Section 2.4 of the Plan Funding Agreement shall apply.

7.7     This Section 7 shall survive any termination of this Agreement.

8.     **GENERAL PROVISIONS**

8.1     Notice of Breach and Termination.  In the event of a material breach of this Agreement by the Master Servicer, on the one hand, or the Service Provider, on the other hand, the party claiming the breach shall give notice of such breach to the other party, which shall have fifteen (15) calendar days to cure such breach or, if such breach is capable of cure within a commercially reasonable period of time but cannot reasonably be expected to be cured within fifteen (15) calendar days, shall have fifteen (15) calendar days to undertake all available and appropriate action to begin the cure of the breach and shall proceed as promptly as possible thereafter to effect the cure.  In the event of such cure in accordance with the immediately preceding sentence, the notice of breach shall be rescinded.  If, however, the breach is not cured as set forth herein, the party claiming the breach may then pursue any and all remedies available to it based on such uncured breach, including but not limited to the right to terminate this Agreement effective on a date of termination prior to the end of the relevant service periods established by the non-breaching party.  A breaching party shall be entitled to no more than one cure period as set forth herein with respect to any one breach.

8.2     Notices.  Any notice or other communication required or permitted to be given hereunder shall be in writing and shall be given, and shall be effective and deemed received, in the same manner as provided in the Plan Funding Agreement.  Such notice or other communication shall be addressed in accordance with the contact information set forth on Schedule 8.2 hereto or, as to any party hereto, in accordance with such other contact information as such party may from time to time specify by giving notice to the other parties hereto in accordance herewith.

8.3     Successors and Permitted Assigns.  This Agreement shall be binding upon and inure solely to the benefit of each party hereto and its successors and permitted assigns.  Nothing in this Agreement is intended to confer upon any other person any rights or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

8.4     Assignment.  No party hereto may assign any of its rights or obligations hereunder without the prior written consent of the other parties hereto.  Notwithstanding the preceding, the parties hereto acknowledge and agree that the Buyer and each Affiliate of the

Buyer (including the Master Servicer) may assign one or more of the Acquired Assets to its Affiliates, and such Acquired Assets shall remain subject to the services contemplated by this Agreement except to the extent that such assignment impedes or prevents the Service Provider from performing its obligations hereunder; provided that any such assignment shall not relieve the Master Servicer of its obligations under this Agreement.

8.5     Remedies.  Except as otherwise expressly provided herein, none of the remedies set forth in this Agreement is intended to be exclusive, and each party hereto shall have all other remedies now or hereafter existing at law or in equity or by statute or otherwise, and the election of any one or more remedies shall not constitute a waiver of the right to pursue other available remedies.

8.6     Headings; Terms.  The headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties hereto and shall not in any way affect the meaning or interpretation of this Agreement.   Unless otherwise indicated, any reference in this Agreement to a section or subsection refers to the specified section or subsection of this Agreement.  Any reference in this Agreement to a "day" or a number of "days" (without the explicit qualification of "business") shall be interpreted as a reference to a calendar day or number of calendar days.  If any action or notice is to be taken or given on or by a particular calendar day, and such calendar day is not a Business Day, then such action or notice shall be deferred until or may be taken or given, on the next Business Day.

8.7     Amendment and Modification.  This Agreement may be amended, modified, supplemented, waived or otherwise modified or terminated only by written agreement of the parties hereto.  No waiver of any provision of this Agreement shall constitute a waiver of any other provision, nor shall any waiver constitute a continuing waiver unless otherwise provided.

8.8     Severability.  Any provision of this Agreement that is prohibited, invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof.  Any such prohibition, invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Upon any such determination that a provision of this Agreement is prohibited, invalid or unenforceable in whole or in part, the judicial body making such determination shall have the power to modify such provision so as to effect the original intent of the parties as closely as possible.

8.9     Counterparts; PDF Facsimile Signatures.  This Agreement may be executed and delivered (including by facsimile transmission or sent by email in portable document format (PDF)) in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other parties hereto, it being understood that all parties hereto need not sign the same counterpart.

8.10     Governing Law.  ALL QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, ENFORCEMENT AND INTERPRETATION OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK, WITHOUT GIVING

EFFECT TO ANY CHOICE OF LAW OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF NEW YORK OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK.

8.11   <u>Jurisdiction</u>.  With respect to any suit, action or proceeding arising out of or relating to this Agreement ("**<u>Proceeding</u>**"), each party hereto hereby irrevocably:

(i)   submits to the exclusive jurisdiction of the Bankruptcy Court, for any Proceeding arising out of or relating to this Agreement and the transactions contemplated hereby (and agrees not to commence any Proceeding relating hereto except in such court) and waives any objection to venue being laid in the Bankruptcy Court whether based on the grounds of forum non conveniens or otherwise; and

(ii)   consents to service of process in any Proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, or by recognized international express carrier or delivery service, to any party hereto in accordance with <u>Section 8.2</u> hereof; <u>provided, however</u>, that nothing herein shall affect the right of any party hereto to serve process in any other manner permitted by Law.

8.12   <u>Waiver of Jury Trial</u>.   TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAWS, EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES AND COVENANTS THAT IT SHALL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON, OR IN CONNECTION WITH, THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.   ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 8.12</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

8.13   <u>Lack of Authority</u>.  Except to the extent contemplated by <u>Section 8.15</u> hereof, no party hereto shall have the authority to commit any other party hereto to any binding obligation or to execute, on behalf of any other party hereto, any agreement, lease or other document creating legal obligations on the part of the other party, and no party shall represent to any third party that it has such authority.

8.14   <u>Force Majeure</u>.  Neither party hereto shall be liable for any failure to perform or any delays in performance, and no such party shall be deemed to be in breach or default of its obligations set forth in this Agreement, if, to the extent and for so long as, such failure or delay is due to any causes that are beyond its reasonable control and without its fault or negligence and the fault or negligence of its Affiliates, including such causes as acts of God, natural disasters, fire, flood, severe storm, earthquake, civil disturbance, lockout, riot, order of any court or administrative body, embargo, acts of government, war (whether or not declared), acts of terrorism, or other similar causes, but excluding, for the avoidance of doubt, bankruptcy,

insolvency, insufficient liquidity and similar events and conditions ("**Force Majeure Event**"). In the event of a Force Majeure Event, the party hereto prevented from or delayed in performing shall promptly give notice to the other party hereto and shall use commercially reasonable efforts to avoid or minimize the delay.  In the event that the delay continues for a period of at least 30 days, the party hereto affected by the other party's delay may elect to suspend performance, extend the time for performance for the duration of the Force Majeure Event and/or terminate this Agreement.

8.15    Debtors' Representative.  All decisions, actions, consents and instructions of the Debtors' Representative shall be final and binding upon SquareTwo and its Subsidiaries, and each and every creditor of SquareTwo and its Subsidiaries, and neither SquareTwo nor any of its Subsidiaries shall have any right to object, dissent, protest or otherwise contest the same.  A decision, act, consent or instruction of the Debtors' Representative in writing shall constitute a decision of all of SquareTwo and its Subsidiaries and shall be final, binding and conclusive upon each of SquareTwo and its Subsidiaries, and the Buyer and the Master Servicer may rely (without any obligation for further inquiry, and disregarding any dispute between the Debtors' Representative and SquareTwo or any of its Subsidiaries) upon any decision, act, consent or instruction of the Debtors' Representative in writing as being the decision, act, consent or instruction of each of SquareTwo and each of its Subsidiaries.  Each of the Buyer and the Master Servicer is hereby relieved from any liability to any Person for any acts done by it in accordance with such decision, act, consent or instruction of the Debtors' Representative in writing.  Any notice or communication delivered to the Debtors' Representative shall be deemed to have been delivered to SquareTwo and its Subsidiaries for all purposes hereof.  Notwithstanding the foregoing, from and after the filing of the Bankruptcy Cases or the Canadian Cases, respectively, the decisions of the Debtors' Representative shall not be binding on SquareTwo and its Subsidiaries until Bankruptcy Court or Canadian Court approval is granted, if such Bankruptcy Court or Canadian Court approval, respectively, is required by Law.

[Signature Page Follows]

4835-1972-3587

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**SERVICE PROVIDER**:
SQUARETWO FINANCIAL SERVICES CORPORATION

By: _____
Name:  J.B. Richardson, Jr._____
Title:  President and Chief Executive Officer

**DEBTORS' REPRESENTATIVE**:

SQUARETWO FINANCIAL CORPORATION

By: _____
Name:  J.B. Richardson, Jr._____
Title:  Chief Operating Officer_____

**MASTER SERVICER**:

RESURGENT CAPITAL SERVICES L.P.

By: _____
Name: _____
Title: _____

**BUYER**:

RESURGENT HOLDINGS LLC

By: _____
Name: _____
Title: _____

[Signature Page to Transition Services Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

**SERVICE PROVIDER**:
SQUARETWO FINANCIAL SERVICES CORPORATION

By: _____
Name: _____
Title: _____

**DEBTORS' REPRESENTATIVE**:

SQUARETWO FINANCIAL CORPORATION

By: _____
Name: _____
Title: _____

**MASTER SERVICER**:

RESURGENT CAPITAL SERVICES L.P.

By: _____
Name: _BRYAN FALIERO_____
Title: _PRESIDENT_____

**BUYER**:

RESURGENT HOLDINGS LLC

By: _____
Name: _BRYAN FALIERO_____
Title: _PRESIDENT_____

[Signature Page to Transition Services Agreement]

ACKNOWLEDGED AND AGREED as of the date first set forth above:

SQUARETWO FINANCIAL CORPORATION

By: _____

Name: J.B. Richardson, Jr.

Title: Chief Operating Officer


COLLECT AMERICA OF CANADA, LLC

By: _____

Name: J.B. Richardson, Jr.

Title: Authorized Signatory


[Signature Page to Transition Services Agreement]

## ANNEX A

### ACQUIRED ASSETS

-Inbound phone numbers (toll or toll-free) used to handle inbound consumers calls.

-Post office boxes used for payments or inbound consumer correspondence.

-Business logic and templates used to create consumer correspondence.

-Copies of all original seller files.

-Copies of all databases developed by S2 and used to evaluate, load, validate or service consumer accounts.

-Electronic copies of all documents relating to consumer accounts owned or serviced by S2 and a mapping file to associate those documents to the original consumer account.

-Internet domain names, logos, trademarks and other web assets related to the S2 entities to be acquired.

-Bank accounts associated with the S2 entities to be acquired.

## ANNEX B

### TRANSITION SERVICES

This schedule is contained in the Excel spreadsheet entitled "S2OpsTransition_externalv4.xlsx", as sent by Jon Mazzoli (jmazzoli@sfg.com), on behalf of the Master Servicer, to J.B. Richardson, Jr. (jbrichardson@squaretwofinancial.com), on behalf of the Service Provider, by e-mail at 7:13 p.m., Eastern Standard Time, on March 1, 2017, a copy of which is hereby incorporated by reference.

## ANNEX C

### ESTIMATED COST OF TRANSITION SERVICES

| | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Total |
|---|---|---|---|---|---|---|---|---|
| **Collection Related Expenses** | | | | | | | | |
| Other Purchased Debt Expenses[1] | 1,071 | 853 | 743 | 640 | 458 | 479 | 252 | 4,496 |
| | | | | | | | | |
| **Personnel and Overhead Costs** | | | | | | | | |
| Personnel | | | | | | | | |
| Operations | 202 | 202 | 323 | 168 | 168 | 335 | 1,021 | 2,418 |
| IT | 390 | 390 | 390 | 719 | 255 | 806 | 496 | 3,446 |
| Customer Experience | 60 | 60 | 60 | 60 | 60 | 141 | 104 | 546 |
| Compliance | 49 | 49 | 49 | 179 | - | - | - | 325 |
| Finance | 52 | 52 | 63 | 76 | 29 | 29 | 151 | 451 |
| Human Resources | 28 | 28 | 28 | 47 | 22 | 22 | 104 | 278 |
| Legal | 6 | 6 | 6 | 6 | 6 | 6 | 27 | 65 |
| Management Center | - | - | - | - | - | - | - | - |
| Fresh View | 8 | 4 | - | - | - | - | - | 11 |
| **Total Personnel** | 794 | 790 | 919 | 1,255 | 541 | 1,339 | 1,903 | 7,540 |
| Overhead | 438 | 386 | 623 | 423 | 355 | 592 | 388 | 3,205 |
| | | | | | | | | |
| **Total Personnel and Overhead** | 1,231 | 1,176 | 1,542 | 1,678 | 896 | 1,931 | 2,291 | 10,745 |
| | | | | | | | | |
| **Admin Fee** | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 1,050 |
| | | | | | | | | |
| **Collection Support Total[2]** | 1,381 | 1,326 | 1,692 | 1,828 | 1,046 | 2,081 | 2,441 | 11,795 |
| | | | | | | | | |
| **Monthly TSA Cash Flow Need** | 2,452 | 2,179 | 2,434 | 2,468 | 1,504 | 2,560 | 2,693 | 16,291 |

[1] Other purchased debt expenses includes other operating expenses (media, skip tracing, etc.), and technical support. These expenses, while included, may be paid by the buyer if more efficient to do so.

[2] Collection support represents personnel, overhead, and admin fees which represent TSA costs.

| Lease Term Costs | |
|---|---|
| IT | 1,461 |
| Non-IT | 878 |
| **Total Term Lease Payments[3]** | **2,339** |
| | |
| [3] Excludes buy-out costs. | |

| Variance Reconciliation | |
|---|---|
| Monthly TSA Cash Flow Need - Original | **18,539** |
| Bonus Pro-Rate Adjustment | (506) |
| 50% Severance Adjustment | (1,096) |
| PTO Adjustment | (646) |
| Adjusted Monthly TSA Cash Flow Need | **16,291** |

The parties acknowledge and agree that the schedule of personnel and their respective costs, as included in the Excel file named "Copy of Sherman TSA Model – v11.xlsx" and sent by Mark Thorson (MThorson@alixpartners.com) to the Master Servicer by e-mail at 11:57 a.m., Eastern Standard Time, on February 24, 2017, are a part of this <u>Annex C</u>, and such file is hereby incorporated by reference.